**E.H. and H.H.**

v.

**Gerald N. TIROZZI, et al.**

**No. H–88–431 (AHN).**

United States District Court,
D. Connecticut.

April 16, 1990.

Douglas M. Crockett, Conn. Legal Services, Willimantic, Conn., for plaintiff.

John Whelan, Asst. Atty. Gen., MacKenzie Hall, Hartford, Conn., Julie Harries, Office of George DuBorg, Wethersfield, Conn., for defendants.

NEVAS, District Judge.

K. is a thirteen year old Downs Syndrome child receiving special education in the public schools of Groton, Connecticut. K.'s parents, E.H. and H.H., have brought this action pursuant to, *inter alia*, the Education of the Handicapped Act ("EHA"), 20 U.S.C. Sections 1400 *et seq.*,[1] to reverse the decision of a state hearing officer and to grant them permission to tape record Planning and Placement Team ("PPT") meetings. The case is now before this court on cross-motions for summary judgment. For the reasons that follow, the plaintiff's motion for summary judgment is granted and the defendant's motion for summary judgment is denied.

*Background of the Stipulation*

The facts of this case are simple and undisputed. K.'s mother is E.H., whose native language is Danish. E.H. has trouble understanding and following both written and spoken English. Pursuant to the EHA, E.H. participates in the development of an Individualized Educational Program ("IEP") for K. Such programs are devel-

1. The plaintiffs have also brought suit pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794 and under traditional contract theory. The court, without passing on the merit of these claims, does not reach them since the court's determination of this case under the EHA is dispositive.

oped at PPT meetings. Among the members of the PPT, and those who normally attend the meetings, is K.'s teacher, E.M.

Because of her difficulty with English, E.H. wished to tape record the PPT meetings. She believed that a tape recording would permit her to listen to the meeting again "at home with a dictionary at hand to assist her in understanding and following what was said." Joint Stipulation of Facts para. 1. E.M., however, did not wish to be tape recorded at the PPT meetings. She felt it would make her uncomfortable and believes that "the taping alienates people and creates tension. She feels that the PPT is a place to exchange ideas and plans and that the taping would interfere with this process." *Id.* para. 6.

Thus, at a 1986 PPT meeting, the Groton Board of Education (the "Board") denied E.H. permission to tape record the communications of PPT members who wished not to be tape recorded. E.H. then requested a hearing on the issue. In response, the Board issued a letter, through its attorney, informing E.H. that she would be permitted to tape record future PPT meetings and that a hearing on the matter would be unnecessary. Subsequently, E.H. withdrew her request for a hearing.

Despite the Board's written permission, at a PPT meeting on February 3, 1987, E.M. refused to allow E.H. to tape record her comments. Instead, she provided a written report and the Board provided a person to take notes when E.M. spoke. E.H. was allowed to tape record the communications of other PPT members who did not object. E.H. felt, however, that the written reports were inaccurate and that the notes of the meeting regarding E.M.'s remarks were unsatisfactory.

In January 1988, E.M. refused to attend K.'s annual review meeting because she had learned that E.H. intended to tape record the meeting. She offered instead to provide a written report and the Board provided a special education teacher, who was personally unfamiliar with K. and his educational progress, to present that report. E.H. and H.H. refused to go ahead without E.M. present. This led to a hearing on March 17, 1988. The hearing officer concluded that E.H. and H.H. did not, as a matter of law, have a right to insist that the PPT meetings be tape recorded. Further, he found that they also failed to demonstrate that tape recording E.M. against her wishes was necessary for K. to receive an appropriate education. The official position of the Board is that taping of a PPT member's comments is permitted only when that member does not object. Otherwise, taping is not allowed.

## DISCUSSION

I. *Cross–Motions For Summary Judgment*

To prevail on a Rule 56 motion, a movant must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. On a motion for summary judgment, the court does not try issues of fact, and summary judgment is inappropriate where factual issues are in dispute. 6 J. Moore, W. Taggart, & J. Wicker, *Moore's Federal Practice* para. 56.04 (2d ed.1988). The burden of demonstrating the absence of a genuine issue rests with the moving party, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden does not shift when cross-motions are before the court: each motion must be judged on its own merits. *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 314 (2d Cir.1981). A comprehensive record has been developed in the administrative proceedings in this case, which has been received by this court in accordance with 20 U.S.C. Section 1415(e)(2). Pursuant to Federal Rule of Civil Procedure 16 and Local Rule 9(c), the parties have stipulated to material facts in conjunction with their cross-motions for summary judgment. Thus, in the instant matter, the parties are not in dispute as to any of the material facts; instead, they differ in their interpretations of the law applicable to the case. Because resolution of questions of law is uniquely a judicial function, the court finds that the cross-motions have placed the disputed issues squarely before the court.

## II. Application of the EHA

### A. Background: The Statutory Scheme of the EHA

The purpose of the EHA is:

to assure that all handicapped children have available to them ... a free appropriate education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of handicapped children and their parents or guardians are protected, ... and to assess and assure the effectiveness of efforts to educate handicapped children.

20 U.S.C. Section 1400(c) (1990). A free appropriate public education entails "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Board of Educ. v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982). The EHA thus confers upon disabled students "an enforceable substantive right to public education...." *Honig v. Doe*, 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988).

The EHA attempts to accomplish its lofty goals through the IEP, a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs. *School Comm. v. Department of Educ.*, 471 U.S. 359, 368, 105 S.Ct. 1996, 2001, 85 L.Ed.2d 385 (1985) (citing 20 U.S.C. Section 1401(19)). The IEP is developed jointly by school administrators, the child's teacher, and the child's parents. 20 U.S.C. Section 1401(19) (1990); *see also School Comm.*, 471 U.S. at 368, 105 S.Ct. at 2001. The EHA, in several places, emphasizes the importance and necessity of parental participation in developing the IEP and assessing its effectiveness. *See* 20 U.S.C. Sections 1400(c), 1401(19), 1412(7), 1415(b)(1)(A)–(E), and 1415(b)(2); 34 C.F.R. Section 300.345 (1989); *see also Honig*, 484 U.S. at 311, 108 S.Ct. at 597; *School Comm.*, 471 U.S. at 368, 105 S.Ct. at 2001.

Furthermore, in the event that the parents are dissatisfied with the IEP, the EHA provides an elaborate scheme of procedural safeguards "that guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12, 108 S.Ct. at 598; *School Comm.*, 471 U.S. at 368–69, 105 S.Ct. at 2001–02. The EHA requires that State educational agencies establish such safeguards and mandates that:

The procedures required by this section *shall include but not be limited to*—

.    .    .    .    .

(E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child.

20 U.S.C. Section 1415(b)(1) (1978) (emphasis added). When such complaints are received, the parents are entitled to an impartial due process hearing to resolve their complaints. *Id.* Section 1415(b)(2).

■ The EHA also provides for judicial review of the decision rendered at the due process hearing, with the reviewing court basing its decision on a preponderance of the evidence. *Id.* Section 1415(e)(2). Although a district court's review should grant due deference to state administrative proceedings, *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050, this stance is addressed at ensuring that courts do not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.; see also Karl v. Board of Educ.*, 736 F.2d 873, 876–77 (2d Cir. 1984). Thus, determinations concerning whether a state has complied with the procedures of the EHA are properly within a district court's province. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3050–51; *Briggs v. Board of Educ.*, 882 F.2d 688, 691 (2d Cir.1989). With this in mind, the application of the EHA to this case is next considered.

### B. Analysis

■ Crucial to the resolution of this case is the framing of the issued here presented.

On the one hand, the issue can be framed, as was done by the hearing officer, as whether E.H. has a right to tape record the comments of E.M., over her objection, at PPT meetings. Conversely, the issue could also be framed as whether E.M. has a right to refuse to be tape recorded. It is therefore appropriate to weigh and balance the interests implicated by either framing.

### 1. The Right to Tape Record PPT Meetings

Neither the EHA nor the regulations promulgated thereunder address the tape recording of PPT meetings. Moreover, no court has construed the statute or regulations to reach a determination on this issue. However, the Office of Special Education Programs ("OSEP"), a subdivision of the Department of Education, issues interpretations of federal regulations to the EHA. In 1981, the Department of Education released its policy interpretations of the IEP requirements. Department of Educ. Policy Interpretation: IEP Requirements, Educ. for Handicapped, L.Rep. (CRR) 103:43 (Apr. 13, 1984). In the preface to these interpretations, the Department offered the following:

> The following regulations and interpretations are intended to provide a comprehensive clarification of IEP requirements, to pose and answer some of the most frequently asked questions about those provisions, and to provide technical assistance. The clarifications and interpretations are legally binding and will be followed by the Department of Education in providing advice and in determining whether affected agencies are in compliance with the Act and regulations. Also included are non-binding suggestions and guidance on how to carry out the various legally binding requirements.
>
> The legally binding requirements in the interpretation are identified by such mandatory language as **"must,"** "the IEP **would have to be** revised," or "labels **may not be** used," and are reproduced in **bold face** type. The non-binding suggestions and guidance are stated in such non-mandatory language as "the agency should" or "it is expected that."

*Id.* One of the questions addressing implementation of the IEP requirements that is not expressly addressed in the regulations, Question 12, answers the question posed in this case:

> 12. *May IEP meetings be tape-recorded?*
>
> The use of tape recorders at IEP meetings is not addressed by either the Act or the regulations. Although taping is clearly not required, it is permissible at the option of either the parents or the agency....

34 C.F.R. pt. 300, App. C. (1989).

Since this language is not mandatory or binding, it has prompted several inquiries regarding the status of tape recording at PPT meetings. Unfortunately, the response of the OSEP has been somewhat equivocal. Initially, the OSEP's informal opinion was that taping should be allowed if either the parents or school officials requested it. The OSEP noted, however, that it did not have authority to require or prohibit recordings; this would require an amendment to the regulations. *See* OSEP Letter to S. McKaig, Educ. For Handicapped L.Rep. (CRR) 211:141–42 (Dec. 19, 1979); OSEP Letter to C. Blades, Educ. For Handicapped L.Rep. (CRR) 211:408–09 (Sept. 17, 1986). Later, in response to a similar inquiry, the OSEP changed its position to state that the language of Question 12 "at the option of either party" meant that either party could tape record the PPT without the permission of the other. OSEP Letter to J. Baugh, Educ. For Handicapped L.Rep. (CRR) 211:479–81 (Aug. 11, 1987). Most recently, the OSEP has determined that this interpretation was inconsistent with the intent and background of Question 12 and was therefore incorrect. Although the OSEP's informal opinion would still permit taping, it did not have the authority to require or prohibit taping at PPT meetings. OSEP Letter to D. Doerr, Educ. For Handicapped L.Rep. (CRR) 213:127–28 (Apr. 15, 1988). Thus, although it cannot require or prohibit tape recording, the OSEP's informal interpretation of the statute and regulations would permit taping. While not binding, this informal view de-

serves great deference. *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

Under the circumstances presented in this case, E.H. should be allowed to tape record the entirety of the PPT meetings over the objection of any member. If the EHA is clear on any point, it is that the Act is designed to help implement individualized and personalized educational plans for handicapped children and their parents. E.H. has difficulty understanding what takes place at PPT meetings. She also finds the notes and reports unsatisfactory, and such prepared materials cannot be expected to address all questions that may arise during the course of the meeting. Moreover, it is difficult to perceive how a teacher who is personally unfamiliar with K. can offer any meaningful response to questions E.H. may have that are not covered in the prepared materials.

A tape recording would allow E.H. to go home and review what was said at the meeting with the aid of a dictionary. It would allow her to go over the meeting again and again, until she was absolutely clear about what her child's IEP for the coming year entailed. It is therefore an essential part of her participation in the planning and evaluation of the IEP, a right she is guaranteed under the EHA. *See Honig*, 484 U.S. at 311–12, 108 S.Ct. at 597–98. Without a clear understanding of what that plan entails, E.H. cannot effectively evaluate the program to determine whether she believes it to be in her child's best interest. *Id.* Accordingly, she cannot complain, in any meaningful way, with respect to any matter relating to the IEP, which is her right under the EHA. 20

U.S.C. Section 1415(b)(1)(E). She is thus effectively deprived of one of the procedural safeguards of the EHA. *Id.* The federal regulations promulgated under the EHA implicitly grant the Board the power to allow E.H. to tape record the meetings in these circumstances:

> The [school board] shall take whatever action is necessary to insure that the parent understands the proceedings at a meeting, *including* arranging for an interpreter for parents who are deaf or whose native language is other than English.

34 C.F.R. Section 300.345 (1989) (emphasis added). Here, allowing E.H. to tape record the meetings is "whatever action is necessary." And use of the word "including" connotes that the actions listed thereafter are not all inclusive.[2] And as mentioned, the EHA emphasizes the importance and necessity of parental participation. Nowhere is this paramount concern clearer than in the development and evaluation of the IEP. In light of the statutory scheme of the EHA, E.H. has a legitimate and substantial interest in tape recording the PPT meetings.

### 2. *The Right to Refuse to be Taped*

The hearing officer found that as a matter of law, E.H. did not have a right to tape record the PPT meetings over the objection of any team member. A discussion of the teacher's right not to be recorded, however, is conspicuously absent from the hearing officer's decision. This court finds that an inquiry into the basis of such right, if one indeed exists, is essential to any thoughtful resolution of this case. As stated, E.M., K.'s teacher, refuses to allow her comments to be tape recorded at PPT meetings. Indeed, she considers it her "right" not to be taped, or not to attend PPT meetings that will be tape recorded. Admin. Hearing Trans. at 72 (March 17, 1988).

**2.** Defendants argue that the conspicuous absence of an express right to tape in the extensive procedural safeguards of the EHA manifests Congress's intent that no such right should exist. This position clearly contradicts the language of 20 U.S.C. Section 1415(b)(1) (1978) ("The procedures required by this section *shall include, but*

*shall not be limited to* "), the OSEP's interpretation of the statute, OSEP Letter to D. Doerr, Educ. For Handicapped L. Rep. (CRR) 213:127–28 (Apr. 15, 1988) (OSEP does not have the authority to require *or prohibit* taping at PPT meetings), and the purpose of 34 C.F.R. Section 300.345 (1978).

From the memoranda and record, two rationales arguably support this right.

It can first be asserted that to allow E.H. to tape record the comments of any PPT member over their objection violates that person's right to privacy. While at first blush this argument is appealing, it is inherently flawed. Although the exact nature and scope of the right to privacy have never been fully defined, the Supreme Court, in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), summarized the relevant case law as follows:

> The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

*Id.* at 598–600, 97 S.Ct. at 876 (footnotes omitted). The second interest clearly is not implicated on the facts of this case. It is also doubtful that the first interest, which could be characterized as an interest in confidentiality, is implicated here. Any official attending a PPT meeting is acting in an official capacity. As such, the matters there discussed are not, for them, personal. Moreover, while the disclosure by school officials of communications that took place during the PPT would raise serious questions regarding confidentiality, the same could not be said of a parental disclosure of similar information.

Assuming *arguendo* that school officials did have a privacy interest in not being tape recorded, their expectation of privacy would be diminished in light of their position and the capacity in which they were acting at a PPT meeting. *See Mack v. United States, FBI,* 653 F.Supp. 70, 75 (S.D.N.Y.1986) (citing *Security & Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 F.2d 187, 202 (2d Cir.1984)), *aff'd,* 814 F.2d 120 (2d Cir.1987). Moreover, such interests would be outweighed by the legitimate and substantial interests of the EHA in ensuring parents a right to meaningful participation and in enforcing the procedural safeguards to protect that

right. *See Kaplan v. Board of Educ.,* 759 F.2d 256 (2d Cir.1985); *Barry v. City of New York,* 712 F.2d 1554, 1560 (2d Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983). What is left, then, is E.M.'s personal predilection against being tape recorded. That such tape recording would make her "uncomfortable," Joint Stipulation of Facts para. 6, is insufficient reason to prohibit E.H. from tape recording E.M.'s remarks when balanced against E.H.'s right to tape. Furthermore, as K.'s teacher, it is her duty to attend the PPT meetings. She cannot, therefore, avoid being tape recorded by avoiding the meetings altogether.

The defendants also assert that to allow tape recording would frustrate the purposes of the PPT meeting, and, therefore, the purposes of the EHA itself. Along these lines, they first contend that it would encourage E.H. to play a passive role at PPT meetings. This would conflict with one of the central purposes of the EHA: that the IEP is to be formulated by both the parents and the school officials. If this were true, it would be a grave concern. However, E.H. has tape recorded meetings in the past and the record does not support the inference that she played a passive role at these meetings. To conclude that she would not participate in the planning of the IEP were she allowed to tape record future PPT meetings is sheer speculation.

The defendants also contend that tape recording can cause mistrust and interfere with the goals of the PPT meetings. In support of this proposition, defendants rely upon an analogy to a similar issue that arose in the context of collective bargaining sessions. Specifically, they cite *NLRB v. Bartlett–Collins Co.,* 639 F.2d 652 (10th Cir.), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). There the court addressed the question of whether an employer's insistence, as a precondition to collective bargaining, that a court reporter transcribe negotiations was a violation of the National Labor Relations Act. The local union had objected to the presence of a court reporter. The NLRB had found that an employer could not insist on such a practice over the objection of the union. In

reviewing the NLRB's decision, the court began its analysis by noting that the NLRB and experts in the field of labor relations "believe that the presence of a court reporter 'has a tendency to inhibit the free and open discussion necessary for conducting successful collective bargaining.' " *Id.* at 656 (citation omitted). The court continued:

It may cause parties to talk for the record rather than to advance toward an agreement. The proceedings may become formalized, sapping the spontaneity and flexibility often necessary to successful negotiations.... The request may give notice that one party lacks confidence in the collective-bargaining process, anticipating litigation rather than agreement. In sum, the process of [negotiation] may be supplanted by the concern for being a careful litigant.

*Id.* (citations omitted).

The reasoning of the tenth circuit is indeed persuasive. But one need not look further than that court's opinion to discover aspects involved in that case which distinguish it from the case at bar.[3] Most important, in rejecting the company's analogy to the recording of adjudicatory proceedings, the court reasoned that:

Agreement is the result of, among other things, the relative economic power of the parties, reason, public opinion, accommodation, and persuasion. The pursuit of truth and justice is not always the guiding beacon in collective bargaining. The goal of ascertaining with 100 percent accuracy what was said in negotiations may be subordinate to other concerns, such as ensuring peaceful resolution of industrial disputes.

*Id.* at 657 (citations omitted). Thus the advantages of recording were outweighed by its negative effects on the bargaining process. *Id.* But in the situation presented here, E.H.'s interest in ascertaining

what was said at the PPT meetings cannot be subordinated to the personal convictions of another party. Undoubtedly, the amount and quality of E.M.'s participation is extremely important to the success of the PPT meetings. But without pointing to some other objective reason why her comments should not be tape recorded, the argument that such taping would make her "uncomfortable," and would thereby interfere with the proper functioning of the PPT working together for the benefit of the child, is completely self-serving. It amounts to a tautological syllogism: tape recording would make her uncomfortable, her discomfort would necessarily thwart the purpose of the PPT meetings, and, therefore, she should not be tape recorded. To countenance such an assertion would subject the procedural safeguards of the EHA to the personal whimsy and caprice of individual PPT members. This Congress could not have intended. In sum, the court finds that E.M. does not have a legitimate and substantial interest in not having her comments tape recorded.

### Conclusion

For the foregoing reasons, the court grants the plaintiff's motion for summary judgment and denies the defendant's motion for summary judgment.

SO ORDERED.

---

**3.** There are other factors which render that court's decision inapplicable here. The court stated that the standard of review governing the NLRB's decision was one of reasonableness, and, therefore, the court gave that decision great deference. *Bartlett–Collins Co.,* 639 F.2d at 657. Moreover, the posture of parties on opposite sides of the collective bargaining process is naturally adversarial. It is therefore understandable why one would not want to create any additional tension in this context. Generally, this is not the case at a PPT meeting. Indeed, this is especially true in this case. E.H., for example, is very happy with the work of E.M. and would like her to continue as K.'s teacher. Joint Stipulation of Facts para. 3.