**Desmond TORRIE, a minor By and Through his mother and next friend, Paula TORRIE, and Paula Torrie, Plaintiffs,**

v.

**Daniel CWAYNA, David Mieras, Fred Bruhn, Mrs. Misze, and Mona Shores School District, Defendants.**

No. 1:92–CV–809.

United States District Court,
W.D. Michigan, S.D.

Jan. 20, 1994.

Kary Love, Kary Love and Associates, Holland, MI, for plaintiffs.

Thomas M. Weibel, Smith, Haughey, Rice & Roegge, P.C., Grand Rapids, MI, James M. Flaggert, Daniel L. Elve, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, MI, for defendants.

## OPINION

QUIST, District Judge.

Desmond Torrie, a handicapped student, and his mother, Mrs. Torrie, brought this action against defendants to recover for alleged violations of the Civil Rights Act, the Individuals with Disabilities Education Act, the Rehabilitation Act, false arrest, false imprisonment, malicious prosecution, intentional infliction of emotional distress, various federal rights, and state tort law. Plaintiffs allege that defendants failed to provide Desmond with a free, appropriate public education. This matter is before the Court on defendants' motion to dismiss and/or for summary judgment.

### Statement of Facts

Plaintiff Desmond Torrie is a minor child born September 9, 1977, who was certified as having a handicapping condition known as an emotional impairment. He was formerly enrolled as a student in the Mona Shores School District and had a high rate of absenteeism and tardiness. Plaintiff Mrs. Torrie is the mother and legal guardian of Desmond. Defendant Fred Bruhn was the Director of Special Education Services for the Mona Shores School District. Defendant

Daniel Cwayna was the principal and defendant David Mieras was the assistant principal of the Mona Shores Junior High School. Ms. Misze was Desmond's classroom teacher.

Desmond was classified as handicapped due to an emotional impairment by the Mona Shores School District in October of 1984, when he was seven years old. As a result of his impairment, he received special education services and an Individualized Educational Program (IEP) designed to meet his unique needs. An Individualized Educational Planning Committee (IEPC) comprised of school officials and Desmond's mother convened periodically to create a written IEP appropriate for Desmond.[1] Some of the IEP reports cited Desmond's high absenteeism and tardiness. The IEP dated June 7, 1988, stated, "very high absenteeism and tardiness rate affects academic growth."

School officials apparently believed that Desmond needed a highly structured program and he was placed in a self-contained room for the emotionally impaired for the majority of each day. He was mainstreamed into regular education classes on a limited basis for subjects such as art, music and physical education.

Mrs. Torrie became dissatisfied with Desmond's placement in a self-contained room. She believed Desmond's resistance to attending school was based, in part, upon his unhappiness with his placement which made him feel isolated from other nonhandicapped children. Consequently, she requested that a new IEPC meeting take place. Mrs. Torrie requested Diana Holmberg, a parent advocate, attend the meeting as an advocate for Desmond. At the meeting held on June 2, 1989, Ms. Holmberg recommended that Desmond be placed in regular education classes with the assistance of aides and special education services. However, school officials supported full time placement in an emotionally impaired program with an hour of mainstreaming each day for reading. As a result of this meeting, Desmond was placed in regular education full time.

Mrs. Torrie contends that Desmond was "exited" from special education and enrolled in regular education without the support of aides or special services in retaliation for her refusal to consent to the self-contained placement. The IEPC Report states, "Desi will be in regular education full time as per mother's request." On page four of the report Mrs. Torrie checked the box that said, "I have been fully informed of my rights and request that the educational programs and services described in this IEPC report be implemented." Her signature appears directly below a statement notifying her of her right to appeal the Superintendent's decision within seven days.

Desmond continued to have attendance and tardiness problems. On October 10, 1990, David Mieras, the assistant principal, called Mrs. Torrie and told her that Desmond would receive an automatic detention if he was tardy from school in the future. Mr. Meiras also allegedly informed Mrs. Torrie that this matter could be referred to a court for prosecution under the state truancy laws. On October 15, 1990, Desmond was given five days of consecutive detention as a result of his absences from school. Mrs. Torrie contends that she told Mr. Mieras that Desmond was afraid to attend school because of the treatment he received. At some point, Mrs. Torrie admitted that she needed help with Desmond's attendance and requested help from the social worker intern. However, no action was taken to convene an IEPC. On October 25, October 31, and November 5, 1990, school officials called Mrs. Torrie to discuss Desmond's continued tardiness and the possible sanctions which could result. A meeting was held on November 8, 1990. At the meeting, Mr. Mieras discussed Desmond's attendance and educational placement with Mrs. Torrie. Mr. Mieras allegedly requested a battery of psychological and emotional testing to assist in arranging a better program for him.

Desmond's grandmother died on November 20, 1990. Plaintiffs contend that her

---

1. It appears that Individualized Educational Programs were signed on the following dates: 10–16–84; 1–7–85; 9–30–85; 3–14–86; 9–2–86 (Desmond was exited from special education on this date because he voluntarily enrolled in a private school); 6–2–87; 9–2–87; 2–8–88; 5–12–88; 6–7–88; 5–23–89; 6–2–89.

death exacerbated Desmond's emotional impairment and increased his unwillingness to attend school. On December 7, 1990, an intern social worker for the junior high school met with Mrs. Torrie and Desmond and advised them that Desmond had to attend school under the threat of criminal prosecution. On December 17, 1990, a Multidisciplinary Evaluation Team Report found Desmond was ineligible for services as an emotionally impaired student. A report submitted by social worker, Steven Overacker, and social worker intern, Vicki Hinshaw stated in part:

As of this date, Desi has been absent 25 full days with 29 tardies. Mr. Mieras and I have spoken with Mrs. Torrie and Desi on numerous occasions regarding the necessity of Desi's attendance in school. Mrs. Torrie does not feel capable of forcing Desi to attend school and has requested assistance. On the other hand, Desi indicates mom doesn't wake up in the morning in time to get him to school. His record indicates absences and tardiness have been a problem throughout Desi's school years. Classroom placement has had little effect on school attendance. During the first grade, when Desi's attendance was the best, mother indicated her twin brother lived with them and was very close to Desi. Mrs. Torrie reports her brother was killed by his wife within the next couple of years.

\* \* \* \* \* \*

The past record indicates placement in the E.I. self-contained classroom did not improve Desi's attendance or tardiness. Furthermore, Desi was able to function and pass in the fifth grade regular education classroom with the assistance of an aide. Therefore, it is the recommendation of this writer that Desi continue in the regular education classroom with special education support services. It would appear that a critical factor to Desi's success is a positive, supportive environment in which his strengths (good language and reading skills artistic talent and enjoying being useful) will be maximized and allow Desi to experience success in the school environment.

On December 17, 1990, David Mieras contacted the Muskegon County Prosecutor and requested assistance in obtaining Desmond's attendance at school. The record shows that during the 1989–90 school year Desmond had been absent or tardy 104½ days out of a total of 182 school days. Between September and December 13, 1990, Desmond was absent or tardy 52 days. Plaintiffs contend in their complaint that the prosecutor was not informed that Desmond was emotionally impaired, learning disabled, or otherwise entitled to special education services or that his poor school attendance might be related to his disability. The prosecutor sent Mrs. Torrie a letter on January 21, 1991. The letter advised her that Desmond's failure to attend school had been referred for possible prosecution.

On January 23, 1991, an IEPC meeting was held to discuss possible changes in Desmond's educational program. Once again Diana Holmberg was present at Mrs. Torrie's request to act as a parent advocate. The IEPC Report from that meeting indicated that Desmond was eligible for special education services because of a specific learning disability. The report did not indicate that he was emotionally impaired. Pursuant to the IEP, Desmond was to spend 80% of his time in regular education classes. He would also receive the services of a teacher consultant 45 minutes a day and social work services 30 minutes per session 3–4 times per month. Mrs. Torrie and Ms. Holmberg suggested a program to motivate Desmond to attend school including a "Circle of Friends" and a shop class. Although school officials allegedly agreed to provide some additional services, these were not written in the IEP. Possible arrest and imprisonment of Mrs. Torrie was also discussed during the meeting. Once again Mrs. Torrie signed the IEP report and checked the box indicating that she had been fully informed of her rights and was requesting implementation of the educational services described in the report. Mrs. Torrie now claims that she signed the report even though it was deficient because Desmond needed help and she thought that by cooperating she could stop the threats of prosecution. At oral argument, Mrs. Tor-

rie's attorney stated that if Mrs. Torrie had not signed the January 21, 1991, IEP, Desmond would have "stayed put" in his prior educational placement—receiving no services and falling further behind. Mrs. Torrie argues that she was between a rock and a hard place and did not have a fair choice.

On February 7, 1991, Mrs. Torrie informed the school that Desmond was upset and did not want to attend school because of problems he was experiencing with school personnel. Mrs. Torrie made an appointment for Desmond with a counselor.

On February 8, 1991, Mr. Mieras again wrote the prosecutor about Desmond's continued absenteeism. Mr. Mieras stated that the school system had "continued to seek all possible in-school alternatives to assist in changing Desmond's behavior."

On February 25, 1991, Mrs. Torrie notified the school that Desmond's absenteeism was due to discrimination he experienced from one or more teachers. Mrs. Torrie indicated that she wanted the situation changed or she would take action to obtain help for Desmond. Mrs. Torrie again contacted the school on February 27, 1991, about the ongoing discrimination her son was experiencing and requested assistance. Plaintiffs allege that in apparent retaliation against Mrs. Torrie for requesting assistance from the school to remedy the discrimination problem, Mr. Mieras filed a complaint against her regarding Desmond's truancy and tardiness problems.

On March 15, 1991, Mrs. Torrie was arrested at her home for violating Michigan's truancy laws. The warrant for her arrest was issued on a complaint signed by Mr. Mieras on February 22, 1991. Mrs. Torrie was handcuffed and transported to the Muskegon County Jail where she was booked and then released on bond. On July 17, 1991, Mrs. Torrie was tried for truancy. A directed verdict was granted in her favor because there was no proof of an attendance officer as required by the Michigan Compulsory attendance statute.

Plaintiffs state that Desmond was seen by Dr. Amante, a licensed psychologist, on July 8, 10, 11, and 12, 1991, for a psychological evaluation. Dr. Amante's affidavit states that in his opinion, Desmond's nonattendance and tardiness at school during the 1990–91 school year were related to his handicapping condition. Plaintiffs have also submitted the psychological report of Dr. F. Mack. Dr. Mack's report indicates that Desmond displays Type 2 school phobic behavior.

Following the 1990–91 academic year, Mrs. Torrie transferred Desmond to the Muskegon Christian School System. He attended classes there for approximately three months. Desmond then received home-tutoring services until approximately March of 1992. Since that time Desmond has apparently received approximately one month of schooling through a home-tutor provided in the fall of 1992. Desmond's deposition testimony indicates that he did not attend any school from September of 1992 to June of 1993.

Plaintiffs initiated this action for monetary and declaratory relief for the alleged false arrest, false imprisonment and malicious prosecution of Mrs. Torrie and for intentional infliction of emotional distress. Plaintiffs have also alleged violations of 42 U.S.C. § 1983, 20 U.S.C. § 1400, 29 U.S.C. § 794, the First Amendment, the equal protection and due process clauses of the Fourteenth Amendment. Defendants have filed a motion to dismiss and/or for summary judgment pursuant to Fed.R.Civ.P. 12(b)(1) and (6) and Fed.R.Civ.P. 56.

### Legal Standard

Summary judgment is appropriate if there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return

judgment for the nonmoving party. *Id.* This standard requires the nonmoving party to present more than a scintilla of evidence to defeat the motion. The summary judgment standard mirrors the standard for a directed verdict. The only difference between the two is procedural. Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. 477 U.S. at 250–51, 106 S.Ct. at 2511. A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* Nos. 91–3529, 91–3385, 91–3529, 4 F.3d 1378 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### *Standard for Dismissal*

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. All factual allegations in the complaint must be presumed to be true and reasonable inferences must be made in favor of the non-moving party. 2A James W. Moore, *Moore's Federal Practice,* ¶ 12.-07[2.5] (2d ed. 1991). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Dismissal is also proper if the complaint fails to allege an element necessary for relief or "if

an affirmative defense or other bar to relief is apparent from the face of the complaint, such as the official immunity of the defendant...." 2A James W. Moore, *Moore's Federal Practice,* ¶ 12.07[2.5] (2d ed. 1991).

### *IDEA*

In the Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, 20 U.S.C. § 1400–1485, Congress sought "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, [and] to assure that the rights of children with disabilities and their parents or guardians are protected." § 1400(c).

In order to qualify for federal assistance under the IDEA, states must demonstrate that they have "in effect a policy that assures all children with disabilities the right to a free appropriate public education." § 1412(1). That policy must be reflected in a plan which is submitted to the Secretary of Education. § 1413(a). The term "free appropriate public education" means special education and related services that are provided at public expense and conform with an "individualized education program." 20 U.S.C. § 1401(18). An individualized education program (IEP) is a written statement which is prepared for each child with a disability at a meeting between a qualified representative of the educational agency, the child's teacher, the child's parent or guardian and, if appropriate, the child. The statement must include the following information:

(A) A statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) a statement of the needed transition services for students.... (E) the projected date for initiation and anticipated duration of such services, and (F) appropriate objective criteria and evaluation

procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. 20 U.S.C. § 1401(20).

The IDEA provides procedural safeguards that guarantee that parents have an opportunity for meaningful input into the decisions affecting their child's education and the right to seek review of decisions they believe are inappropriate. These safeguards include the right to examine all relevant records with respect to the identification, evaluation, and educational placement of the child and to obtain an independent educational evaluation of the child; prior written notice whenever the educational agency proposes to initiate or refuses to initiate a change in the child's placement or program; an opportunity to present complaints regarding matters relating to the free appropriate public education; and an opportunity for an impartial due process hearing with respect to such complaints. 20 U.S.C. § 1415(b)(1) and (2). Michigan has implemented the IDEA through the Mandatory Special Education Act codified in M.C.L.A. 380.1701.

Plaintiffs have stated that the core of their claim is that the Mona Shores School District failed in its duty to provide Desmond with a free, appropriate public education. According to plaintiffs, when Desmond manifested an unwillingness to attend school, the Mona Shores School District had a responsibility to evaluate him and determine if his nonattendance was related to his disability. If it was related to his disability, plaintiffs allege that the school system had a responsibility to proactively formulate an IEP for Desmond that would encourage his attendance at school. Plaintiffs argue that instead of dealing with Desmond's disability by creating an appropriate IEP, the school district retaliated against plaintiffs by "exiting" Desmond from special education and bringing criminal proceedings against Mrs. Torrie.

In essence, plaintiffs appear to be asserting two claims, although their brief combines them into one argument. The first is that the Mona Shores School District violated the IDEA by not formulating an appropriate educational program for Desmond. Their second claim is that the Mona Shores School District failed to exhaust IDEA remedies and thus it was not permitted to utilize criminal proceedings against Mrs. Torrie. These claims will be addressed in the order outlined above.

Plaintiffs contend that the defendants failed to provide Desmond with the proper programming to allow him a free appropriate education under the IDEA. However, plaintiffs have failed to exhaust their administrative remedies with respect to this claim. Exhaustion of administrative remedies is a necessary prerequisite to filing a suit in state court or federal district court. In *Crocker v. Tennessee Secondary School Athletic Ass'n.*, 873 F.2d 933 (6th Cir.1989), the Sixth Circuit analyzed the IDEA as follows:

> Every court that has considered the question has read this statutory scheme as a requirement for the exhaustion of administrative remedies. In case after case courts have read the statutory scheme to require parents and guardians to *use* the state process which the act specifies shall be provided to them.

> \*   \*   \*   \*   \*   \*

> Indeed, we cannot imagine any other reading of the statute. Only parties 'aggrieved' by the results of the administrative process are granted a right of action in state or federal court. 20 U.S.C. § 1415(e)(2). To allow parents to come directly to federal courts would render the entire scheme of § 1415 nugatory.... In particular, it would frustrate the Act's specific direction that in 'any action' brought in state or federal court under this section, 'the court shall receive the records of the administrative proceedings[.]' 20 U.S.C. § 1415(e)(2).

873 F.2d at 935 (citations omitted) (emphasis in original). *See also Waterman v. Marquette–Alger Intermediate School Dist.*, 739 F.Supp. 361, 364–65 (W.D.Mich.1990). 20 U.S.C. § 1415(e)(2).

Although Mrs. Torrie signed the IEPC report which informed her of her rights, including her right to appeal, plaintiffs neither requested an impartial due pro-

cess hearing nor filed a complaint with the Mona Shores School District. Plaintiffs contend that exhaustion of their administrative remedies is not required because the procedure would have been futile or inadequate. Plaintiffs believe it would have been futile because they no longer live in the Mona Shores School District. The Sixth Circuit rejected a similar argument in *Doe By and Through Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir.1989), *cert. denied*, 493 U.S. 1025, 110 S.Ct. 730, 107 L.Ed.2d 749 (1990), stating that "parents' unilateral act of removing their child from a public school ... does not mean that the procedures in the [IDEA] may be by-passed. Absent a showing that exhaustion of the administrative process would be futile or inadequate, ... parents and guardians [must] *use* the state process which the act specifies shall be provided to them."

■ I am similarly unpersuaded by plaintiffs' argument that exhaustion is not required because a hearing officer is not authorized to award damages for violations of Section 504 of the Rehabilitation Act. As stated by the court in *Waterman*, "the fact that administrative authorities may not be empowered to provide all the relief plaintiffs request is immaterial. A procedure that may result in any substantial relief is not futile." 739 F.Supp. at 368 (citation omitted).

■ Plaintiffs also claim that the defendants were not permitted to proceed against Mrs. Torrie for criminal truancy until they had exhausted their rights under the IDEA. Plaintiffs rely extensively upon *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), to support their position. In *Honig*, officials of the San Francisco Unified School District tried to expel two emotionally disturbed children from school indefinitely for violent and disruptive conduct related to their disabilities. *Id.* at 312, 108 S.Ct. at 598. The Court held that an indefinite suspension violated the provisions of the IDEA. *Id.* at 323, 108 S.Ct. at 604. The Court relied upon § 1415(e)(3), which states that during the pendency of any proceedings initiated under the Act, unless the state or local educational agency and the parents of a disabled child otherwise agree, "the child *shall* remain in the then current educational placement." *Id.*

Thus, school authorities were prohibited from unilaterally excluding disabled children from the classroom for dangerous conduct arising out of their disabilities. However, school officials could suspend a dangerous child for up to ten days without violating the Act.

Our conclusion that § 1415(e)(3) means what it says does not leave educators hamstrung. The Department of Education has observed that, "[w]hile the [child's] placement may not be changed [during any complaint proceeding], this does not preclude the agency from using its normal procedures for dealing with children who are endangering themselves or others."

\*   \*   \*   \*   \*   \*

Such procedures may include the use of study carrels, timeouts, detention, or the restriction of privileges. More drastically, where a student poses an immediate threat to the safety of others, officials may temporarily suspend *him or her* for up to 10 schooldays.

*Id.* at 325, 108 S.Ct. at 605.

Plaintiffs also rely upon *Flint Board of Education v. Williams*, 88 Mich.App. 8, 276 N.W.2d 499 (1979), another case in which the school system was attempting to remove a handicapped student from school.

The cases relied upon by the plaintiff are distinguishable. In the case before the Court, the Mona Shores School District was not attempting to expel Desmond from school. Indeed, to the contrary, the school system was attempting to compel Desmond's attendance at school. Although Mrs. Torrie was temporarily detained by the police department, her son's education was not obstructed. Mrs. Torrie's arrest did not effectuate a change in Desmond's educational placement or his IEP. Consequently, I find that the defendants' conduct did not violate the provisions of the IDEA.

### The Rehabilitation Act and 42 U.S.C. § 1983

■ Plaintiffs also allege that because Desmond's handicap interfered with his attendance, Desmond was not provided a free appropriate public education in violation of

section 504 of the Rehabilitation Act (RHA), 29 U.S.C. § 794, which provides in part:

> No otherwise qualified individual with handicaps in the United States, ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

Courts have interpreted this section to include educational programs receiving federal financial assistance.

■ Plaintiffs also appear to be seeking recovery for alleged noncompliance with the IDEA through 42 U.S.C. § 1983. Section 1983 is generally available to redress violations of federal statutes by state actors. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

Plaintiffs' claims under section 1983 and the Rehabilitation Act may not go forward, however, because plaintiffs have failed to exhaust the IDEA administrative process. In *Waterman v. Marquette–Alger Intermediate School Dist.*, 739 F.Supp. 361 (W.D.Mich. 1990), the court held that "exhaustion must occur before plaintiffs may file an action under *any other federal law* seeking relief that is also available under the [IDEA]. 20 U.S.C. § 1415(f)." *Id.* at 365 (emphasis added). *See also Lawson v. Edwardsburg Public School*, 751 F.Supp. 1257, 1261 (W.D.Mich.1990) ("Since a Section 1983 litigant seeking redress for a violation of [IDEA] would not have to utilize the statute's administrative remedies, this provision may not be used to enforce rights protected by the [IDEA].... Therefore, the Court dismisses the Section 1983 claim with prejudice"); *Carey on Behalf of Carey v. Maine School Administrative Dist. No. 17*, 754 F.Supp. 906, 923 (D.Me.1990) ("the exhaustion requirements of the [IDEA] apply to all claims under the RHA seeking to enforce rights guaranteed by the [IDEA]. 20 U.S.C. § 1415(f). Thus, Plaintiffs must exhaust the administrative remedies of the [IDEA] before bringing their claim under the RHA to this Court").

In this case, plaintiffs' claims under Section 1983 and the Rehabilitation Act, Section 504, seek relief that is also available under the IDEA. Plaintiffs claim that defendants denied Desmond a free public education by "exiting" him from special education programs and having his mother arrested for violating the state's compulsory education laws. Because plaintiffs have not exhausted the IDEA administrative process their claims under these statutes may not go forward. The fact that plaintiffs seek money damages which are not available under the IDEA is immaterial. *See Waterman*, 739 F.Supp. at 365.

### Equal Protection

■ Plaintiffs also assert that defendants violated their rights under the Equal Protection Clause of the Fourteenth Amendment. Their complaint lists four instances in which Desmond was allegedly treated differently than others: he was required to enter the school building through the front doors even though other non-handicapped students were allowed to enter other doors; he was required to produce a signed doctor's note for future absences or tardies when other students were allowed excused absences based upon parental statements; he was required to obtain an admission slip from the office when he was tardy although other students did not need to do so; and finally, his mother was selectively prosecuted for violating the compulsory attendance laws.

■ The Equal Protection Clause of the Fourteenth Amendment forbids governmental decisionmakers from treating differently "persons who are in all relevant respect alike." *Nordlinger v. Hahn*, —— U.S. ——, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). Plaintiffs have not shown how Desmond was treated differently than other students with similarly high rates of absenteeism and tardiness. Because plaintiffs have no evidence that their treatment was different than other persons who were similarly situated, they cannot recover under this theory of liability.

### False Arrest, False Imprisonment and Malicious Prosecution

■ Plaintiffs have alleged a claim for false arrest, false imprisonment, and mali-

cious prosecution under the Fourth and Fourteenth Amendments to the Constitution and 42 U.S.C. § 1983. Mrs. Torrie was arrested for violating Michigan's compulsory attendance law, M.C.L.A. 380.1561; M.S.A. 15.41561, because she failed to send Desmond to school. The statute provides in part:

> [E]very parent, guardian, or other person in this state having control and charge of a child from the age of 6 to the child's sixteenth birthday, shall send that child to the public schools during the entire school year. The child's attendance shall be continuous and consecutive for the school year fixed by the school district in which the child is enrolled.

A parent who fails to comply "is guilty of a misdemeanor, punishable by a fine of not less than $5.00 nor more than $50.00, or imprisonment for not less than 2 nor more than 90 days, or both." M.C.L.A. 380.1599; M.S.A. 15.41599.

Plaintiffs claim that defendants Mieras and Bruhn did not advise the prosecutor's office that Desmond had been identified as a special education student, or that his poor attendance might be related to his disability. According to plaintiffs, defendants' failure to divulge this information resulted in a warrant which was based upon false, inaccurate, or incomplete information.

I find no factual support for the plaintiffs' position. The record indicates that Mrs. Torrie's arrest was based upon probable cause and a valid arrest warrant. The facts are undisputed that Mrs. Torrie failed to send Desmond to school. I have been unable to find any legal support for the plaintiffs' contention that Michigan's compulsory attendance laws do not apply to handicapped students or that defendants had an obligation to inform the prosecutor that Desmond was receiving special education services. Plaintiffs' claims of false arrest, false imprisonment and malicious prosecution must fail.

### Intentional Infliction of Emotional Distress, Selective Prosecution, First Amendment

Plaintiffs' claims for intentional infliction of emotional distress, selective prosecution, and violation of the First Amendment also fail. I find nothing in the record to indicate that the defendants' actions amounted to extreme or outrageous conduct. The record also fails to establish that others with similarly dismal attendance records were not prosecuted. As for their First Amendment claim, plaintiffs have failed to show how any First Amendment theory applies. Furthermore, plaintiffs did not assert a First Amendment claim in the complaint or the amended complaint.

### State Tort Law

Because this Court is dismissing all of plaintiffs' federal causes of action I have decided, in accordance with 28 U.S.C. § 1367(c)(3), that this Court will not exercise its supplemental jurisdiction over the remaining state law claims. I point out to the parties the tolling of the period of limitations as provided in 28 U.S.C. § 1367(d).

### CONCLUSION

The defendants' motion is granted based upon the analysis set forth above. All of the plaintiffs' federal claims are dismissed. Because of ambiguities in the plaintiffs' complaint, it is not clear if any state law claims remain. If there are any remaining state law claims, they are DISMISSED WITHOUT PREJUDICE.