**UNITED FARMWORKERS OF AMER-ICA, AFL–CIO; Farm Labor Organizing Committee, AFL–CIO; Juan Flores and Juan Ramirez, Plaintiffs,**

v.

**Elaine CHAO, Secretary of Labor, and U.S. Department of Labor, Defendants.**

**No. 01–CV–1356.**

United States District Court, District of Columbia.

Sept. 10, 2002.

---

David Palmer Dean, James & Hoffman, P.C., Washington, DC, for Plaintiffs.

Brian J. Sonfield, U.S. Attorney's Office, Washington, DC, for Defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs are the United Farmworkers of America, AFL–CIO; Farm Labor Organizing Committee, AFL–CIO; and Juan Flores and Juan Ramirez, who are temporary foreign agricultural workers. They bring this action under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 553, 706(1), 706(A), to enjoin Defendants, Elaine Chao, Secretary of Labor, and the U.S. Department of Labor ("DOL") from adopting an interpretation of a regulation concerning announcement of the minimum

rates that must be paid to foreign agricultural workers.

This matter is before the Court on the parties' motions for summary judgment. Upon consideration of the motions, oppositions, replies, the Motions Hearing held in this matter on August 19, 2002, and the entire record herein, for the reasons stated below, the Court finds that Defendants' Motion for Summary Judgment is **granted in part and denied in part**, and Plaintiffs' Motion is **granted in part and denied in part.**

## I. BACKGROUND [1]

This case concerns a dispute over DOL's interpretation of its regulation setting forth the minimum wage at which foreign temporary agricultural workers may be employed. That wage is known as the "adverse effect wage rate" or ("AEWR") and is published annually for each state by DOL.[2]

### 1. Statutory Context

DOL issues AEWRs under the Immigration and Naturalization Act of 1952 ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1188(a).

The INA establishes the "H–2A program," which governs admission of temporary foreign agricultural workers. Before an employer may hire foreign agricultural workers, the INA requires the Secretary of Labor to "certify" that: "(A) there are not sufficient workers who are able, willing and qualified, and who will be available at

the time and place needed, to perform the labor services involved in the petition, and (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." [3] *Id.*

DOL has adopted regulations to implement Congress's mandate prohibiting "adverse effects" on domestic wage rates. One of those regulations is the AEWR regulation in dispute in this case.

The AEWR regulation provides in full: (a) Computation and publication of AEWRs. Except as otherwise provided in this section, the AEWRs for all agricultural employment (except for those occupations deemed inappropriate under the special circumstances provisions of § 655.93 of this part) for which temporary alien agricultural labor certification is being sought *shall be equal to the annual weighted average hourly wage rate for field and livestock workers (combined) for the region as published annually by the U.S. Department of Agriculture (USDA) based on the USDA quarterly wage survey.* The Director shall publish, at least once in each calendar year, on a date or dates to be determined by the Director, AEWRs for each State (for which USDA publishes regional data), calculated pursuant to this paragraph (a) as a notice or notices in the Federal Register.

20 C.F.R. § 655.107(a) (emphasis added).

In order to avoid "adverse effects" on domestic wages, the regulation requires

---

**1.** Unless otherwise noted, the facts contained in this Section are undisputed by the parties.

**2.** *DOL regulations require that temporary alien workers be offered the highest of three minimum wage rates: the state or federal minimum wage, the local prevailing wage for the particular job, or the AEWR. 20 C.F.R. § 655.102(b)(9). Because the AEWR has consistently been the highest of the three rates in*

all states, it has become the minimum wage rate paid by employers to temporary agricultural workers.

**3.** Once the Secretary grants certification, an employer petitions and receives from INS temporary, non-immigrant visas for the foreign agricultural workers employed for that year, known as "H–2A visas." (20 C.F.R. § 655.3; 8 C.F.R. § 214.2(h)5).

that AEWRs at least equal the USDA agricultural wage rates. *Id.; AFL–CIO v. Dole,* 923 F.2d 182, 184 (D.C.Cir.1992) (AEWRs "would be the previous year's annual regional average hourly wage for agricultural workers (the USDA average wage)...").

## B. Plaintiffs' Challenge to DOL's AEWR Policy

Plaintiffs' challenge to DOL's interpretation of the AEWR regulation concerns *when* during the year AEWRs must be published. Since the regulation was first adopted in 1987, DOL has always published the rates prior to commencement of the H–2A employment period, which begins in April and ends in October.

In 2001, DOL published AEWRs on August 2. DOL acknowledged that the publication was later than usual, but explained that the regulation does not require publication of the wage rates before December 31. *See* Declaration of Christopher T. Spear, Assistant Secretary for Policy, DOL, ¶ 5 ("Spear Decl."). DOL also explained that its delay was based on a Memorandum from the then-new Administration, and on the urging of certain Congress persons reviewing the H–2A program.[4]

Plaintiffs contend that DOL essentially changed its AEWR wage policy in 2001 by publishing AEWRs in August and by insisting that it may continue in future years to publish them as late as December 31. Specifically, Plaintiffs argue that the December 31 publication deadline is a change in policy because until new AEWRs for a

given year are published, workers receive only the AEWRs for the previous year. Plaintiffs emphasize that as a result, the AEWRs paid for a given year will not "be equal to" the USDA rates for that year, as required by the regulation. Plaintiffs maintain that DOL must therefore follow its previous practice of publishing AEWRs for a given year prior to commencement of the H–2A employment period.

## II. STANDARD OF REVIEW

■ Under the APA, reviewing courts are to "hold unlawful and set aside" an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court accords "substantial deference" to an agency's interpretation of its own regulations, *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986), but an agency's interpretation cannot be sustained if it is " 'plainly erroneous or inconsistent with the regulation.' " *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (internal citations omitted); *Loewendick & Sons, Inc. v. Reich,* 70 F.3d 1291, 1294 (D.C.Cir.1995).

■ Courts are generally deferential to longstanding policies or statutory interpretations of an agency, and they must closely examine recent departures from such agency precedent. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

---

**4.** The new administration issued a "Card Memorandum," which ordered agencies to stay, for 60 days, implementation of rules which have not become effective so that the new administration could review them. DOL stated that "while the Card Memorandum did not apply specifically to the publication of the AEWR, it was decided...that it would be consistent with the spirit of the Card memo-

randum to postpone publication until the new DOL team was in place and could review the issue." *Id.*

In particular, DOL explained that it had received "comments from agricultural employers requesting further study of the AEWR methodology because the data used produces wage rates which were too high." Spear Decl. ¶ 6.

### III. ANALYSIS

Plaintiffs have asserted the following three claims under the APA. First, DOL did not follow the notice-and-comment provisions of the APA, 5 U.S.C. § 553, when it delayed publication of AEWRs in 2001 and stated that they could be published as late as December 31 in any given year. Second, Defendants' decision to wait until August 2001 to issue the 2001 AEWRs constituted "unreasonable delay" under the APA (Count 2). 5 U.S.C. § 706(1). Third, the reasons provided for the delay in 2001 were "arbitrary and capricious" (Count 3). 5 U.S.C. § 706(A).

Before turning to the merits of Plaintiffs' claims, the Court addresses two threshold issues raised by Defendants, namely mootness and ripeness.

### A. Plaintiffs' Entire Case Is Not Moot

■ DOL argues that the entire case is moot because Plaintiffs filed it to compel publication of the 2001 AEWRs, which were subsequently published in August of 2001.

Although Plaintiffs' most pressing concern was to compel publication of the 2001 AEWRs, they are also challenging in Count I DOL's departure from its policy of publishing, without notice and comment, the AEWRs prior to commencement of the H–2A employment period. Consequently, Count I is not moot.

However, Counts II and III, namely that the August 2001 AEWR publication was "unreasonable" and based on "arbitrary and capricious" reasons, are moot because they relate to the failure of DOL to timely publish AEWRs in 2001. Those AEWRs have now been published.

Plaintiffs contend that Counts II and III should not be dismissed as moot because they are the paradigmatic "capable of repetition, yet evading review." [5] Plaintiffs argue that DOL might "unreasonably" delay publication of AEWRs in subsequent years and might rely on the same "arbitrary and capricious" reasons to do so.

With respect to Plaintiffs' fear that DOL could unreasonably delay AEWR publication in the future, that concern is fully encompassed in Plaintiffs' Count I, which is a challenge to DOL's departure from its pre-existing policy of publishing AEWRs before commencement of the H–2A employment period commences.

With respect to Plaintiffs' fear that DOL could again rely on arbitrary and capricious reasons to delay AEWR publication, Defendants have established that reliance on the Card Memorandum is *not* likely to recur.[6] *See* Spear Decl. 6–7; Defs.' Reply at 12. Moreover, DOL's reliance on letters from members of Congress is not "arbitrary and capricious" as a matter of law. The Court cannot conclude that Congress never intended DOL to ever consider Congressional opinion when administering the H–2A program.[7] Moreover, any

---

**5.** *Honig v. Doe,* 484 U.S. 305, 318–323, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

**6.** Where voluntary cessation is the basis for mootness, as here, Defendants have the burden of showing that the challenged action will not recur. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

**7.** *See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins.*

*Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

such claim would have to be considered in its specific factual context.

Accordingly, the Court concludes that Counts II and III shall be dismissed as moot.

### B. Count I Is Ripe For Review

DOL argues that Count I is not "ripe." First it argues that there is no "new policy" to review because its interpretation is consistent with the plain language of the regulation. Second, it argues that even if its policy has shifted, it has not yet "sufficiently crystallized." *See* Defs.' Reply at 7. DOL has not, for example, announced a date certain on which all AEWRs will be published in the future, or specified the "circumstances which must occur before the AEWRs are issued." *See* Defs.' Opp'n to Pls.' Mot. Summ. J. at 4 ("Defs.' Opp'n"); Defs.' Mot. for Summ. J. at 13 ("Defs.' Mot.").

Ripeness involves an evaluation of "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). A case is ripe "when it 'presents a concrete legal dispute [and] no further factual development is essential to clarify the issues...'" *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C.Cir.1999).

Since 1989, when the final AEWR regulation was issued, DOL has interpreted it to mean that AEWRs will be published before the H–2A employment period and early enough so as to effect an equivalence with the USDA wage rates for the previous year. This interpretation is contained in DOL's comments accompanying initial publication of the AEWR regulation in the Federal Register;[8] has been recognized by this Circuit;[9] and is contained in a DOL H–2A Handbook.[10] Furthermore, it is consistent with the Department's long-standing practice of publishing AEWRs prior to commencement of the H–2A employment period, usually in February or March.[11]

In 2001, DOL took a different tack, delayed publication until August, and stated that it could publish AEWRs as late as December 31, notwithstanding that such publication would unquestionably result in payment of rates that are below "the current average agricultural wage," as computed by USDA for the prior year.

In light of DOL's change in position, Plaintiffs' challenge presents a "concrete legal dispute" that is "fit" for judicial decision.

### C. DOL Must Provide Opportunity for Notice and Comment

The Court now turns to the merits of Plaintiffs' notice and comment claim. It

---

8. The DOL stated that the new AEWR would be "equal to the previous year's annual regional average hourly wage rates for field and livestock workers (combined), as computed by USDA quarterly wage surveys." *See* Labor Certification Process for H–2A Workers, 52 Fed.Reg. 20,496, 20,502–505 (June 1, 1987) ("Interim Final Rule"). In publishing its final rule, the DOL reiterated that the rate paid would be equal to the "current average agricultural wage." 54 Fed.Reg. 28,037 (July 5, 1989).

9. *See AFL–CIO v. Dole*, 923 F.2d 182, 184 (D.C.Cir.1991) (approving rule and noting that the "adverse effect wage rate would be

the previous year's annual regional average hourly wage for agricultural workers").

10. The Handbook specifies that "the AEWRs are usually published in March or April, and become effective immediately upon publication." 53 Fed.Reg. 22,076, 22,095 (June 13, 1988).

11. "[P]ast practice ... should be given the deference ordinarily accorded any interpretation of a statute by the agency charged with its enforcement." *Gelman v. Federal Election Comm'n*, 631 F.2d 939, 943 (D.C.Cir.1980).

is axiomatic that agencies must interpret their own legislative regulations in a manner that is consistent with previous interpretations or else provide opportunity for notice and comment under § 553 of the APA. *See National Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan,* 979 F.2d 227, 231–32 (D.C.Cir.1992) ("[An agency] may not alter, without notice and comment, [regulations] unless such a change can be legitimately characterized as merely a permissible interpretation of the regulation, consistent with its language and original purpose"); *Paralyzed Veterans of America v. D.C. Arena L.P.* 117 F.3d 579, 586 (D.C.Cir.1997) (rule-making required where the agency affects a "fundamental change in its interpretation of a substantive regulation").

 DOL's new interpretation is at odds with the governing statute and regulation. As discussed below, the INA and AEWR regulation require that AEWRs paid during the agricultural season equal the most current USDA wage rates. This mandated equivalency cannot be achieved if DOL publishes AEWRs after the H–2A employment period begins. DOL must either publish AEWRs prior to the H–2A period or provide notice and comment that it is no longer doing so.

1. **AEWRs Must Equal Current USDA Wage Rates**

Under the INA, as amended by the IRCA, the Secretary is required to certify that: "the employment of [temporary alien labor] will not *adversely affect* the wages

and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(B).[12]

The INA leaves to DOL the task of designing an AEWR policy that does not "adversely affect" domestic wages. *AFL–CIO v. Brock* 835 F.2d 912, 914 (D.C.Cir. 1987). In adopting an AEWR policy, DOL must balance the competing goals of the statute—providing an adequate labor supply to growers and protecting the jobs of domestic farmworkers.

After passage of the IRCA in 1986, DOL abandoned its former methods[13] of calculating AEWRs in favor of the current method, whereby AEWRs equal the current USDA rates. That method is set forth in the disputed regulation, which provides:

the AEWRs for all agricultural employment ... *for which temporary alien agricultural labor certification is being sought shall be equal to the annual weighted average hourly wage rate for field and livestock workers (combined) for the region as published annually by the U.S. Department of Agriculture (USDA) based on the USDA quarterly wage survey.*

20 C.F.R. § 655.107(a) (emphasis added).

Consistent with the statutory purpose of avoiding adverse effects on domestic wages, the language requires that AEWRs equal the annual USDA rates. *Id.* ("the AEWRs for all agricultural employment ... for which ... labor certification is being sought, *shall be equal* to the USDA

---

**12.** Prior to the IRCA of 1986, the "adverse effect" requirement was contained in a regulation issued pursuant to the INA of 1952, not in the INA itself. The IRCA expressly incorporated the adverse effect prohibition contained in the previous regulations by amendment so that it became a statutory mandate that domestic workers should not be injured

by depressed wages paid to foreign workers. Pub.L. No. 99–603, 100 Stat. 3359, § 301(c).

**13.** DOL has used a number of methods for calculating the AEWR over the years, first measuring and using the prevailing wage rate, then adopting various rough proxies for the supposed degree to which prevailing wages have been depressed by foreign labor.

rates as published annually.") (emphasis added).

■ Its own comments accompanying the regulation confirm that the regulation requires AEWR and USDA rate equivalency.[14] For example, in publishing the final rule, DOL stated that the rate paid would be equal to the "current average agricultural wage." 54 Fed.Reg. 28,037 (July 5, 1989).[15]

Furthermore, this Circuit has recognized that the regulation requires equivalency with USDA rates. *See Dole*, 923 F.2d at 184 (upholding the AEWR regulation and noting that it was a "new, simpler methodology in which the [AEWRs] would be the previous year's annual regional average hourly wage for agricultural workers (the USDA average wage) with no added adjustments."). Thus, the AEWR regulation at issue requires that the AEWRs in effect equal the current USDA wage rates.

## 2. DOL Must Publish the AEWRs Before Commencement of the H–2A Employment Period

Before 2001, DOL had consistently published AEWRs prior to commencement of the H–2A employment period, always by April, and usually in February or March of the year in question, DOL now maintains that it may publish the AEWRs as late as December 31. This view is irreconcilable with the regulation, and represents a departure from prior practice.

As discussed above, the AEWR regulation requires that AEWRs "shall equal" the current USDA data. This will not occur under DOL's interpreataion.[16] It is undisputed that the AEWRs are not effective until they are published, and that the previous year's AEWRs, based on two year old USDA data, are paid to agricultural workers until publication of the current AEWRs.

---

14. A court looks to an agency's intent at the time or promulgation when scrutinizing any subsequent challenged interpretation. *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988) ("[W]e are properly hesitant to substitute an alternative reading for the Secretary's unless that alternative reading is compelled by...indications of the Secretary's intent at the time of the regulation's promulgation."); *S.G. Loewendick & Sons, Inc.*, 70 F.3d at 1295 (declining to defer to DOL's interpretation of an OSHA regulation because it would be contrary to OSHA's intent at the time the regulation was promulgated, as reflected in the comments included with final publication of the rule.).

15. When DOL originally promulgated the 655.107(a) to implement the "adverse effect" provision of the statute, it specifically stated that the long-established practice of establishing AEWRs "at or above average hourly wages in agriculture" was a "basic concept" that Congress had "endorsed...it its passage of IRCA." Labor Certification Process for H–2A Workers, 52 Fed.Reg. 16,770, 16,776 (May 5, 1987) (to be codified as 20 C.F.R. 654 and 655 ("Proposed Rule")).

In promulgating the interim rule, DOL stated that the AEWR would be "equal to the previous year's annual regional average hourly wage rates for field and livestock workers (combined), as computed by USDA quarterly wage surveys." *See* Labor Certification Process for H–2A Workers, 52 Fed.Reg. 20,496, 20,502–505 (June 1, 1987) ("Interim Final Rule").

16. During the Motions Hearing, parties indicated that USDA rates were published in November. DOL stated that if it chose to publish the AEWRs on December 31, 2001, for example, it would rely on the November 2001 USDA rates, skipping the USDA 2000 rates altogether. This outcome would contravene the express regulatory requirement that the AEWRs "shall be equal" to the USDA rate "as published *annually*" by the USDA. That is, DOL would have skipped from the 1999 USDA rate to the 2001 USDA rate.

On the other hand, if DOL relied on the November 2000 rates (and not the more current November 2001 rates) when publishing AEWRs on December 31, 2001, the published rates would not equal the most current USDA rates. Either way, DOL runs afoul of an express regulatory requirement.

. Moreover, although the plain text of the regulation provides no date certain for AEWR publication, it does indicate that the AEWRs will be published in advance of the anticipated agricultural season, *i.e.*, referring to "the AEWRs for all agricultural employment ... for which temporary labor certification *is being sought.*" 20 C.F.R. 655.107(a) (emphasis added).

The DOL H–2A Handbook confirms that "the AEWRs are usually published in March or April, and become effective immediately upon publication." 53 Fed.Reg. 22,076, 22,095 (June 13, 1988). Similarly, the initial comments accompanying adoption of the regulation repeatedly emphasize the importance of early publication.[17]

The DOL now proposes an interpretation that is a clear departure from the text and intent of the regulation and from its own longstanding policy of publishing prior to the H–2A period. Consequently, given the mandate that AEWRs should be equivalent to current USDA wage rates, and given that such equivalence cannot be achieved if publication does not occur prior to the H–2A employment period, DOL must either adhere to its original interpretation and publish prior to the H–2A period or provide opportunity for notice and comment as required under the APA.

## IV. CONCLUSION

For the foregoing reasons, the Court **grants in part and denies in part** Plaintiffs' Motion for Summary Judgment and **grants in part and denies in part** Defendants' Motion for Summary Judgment. An Order will issue with this Opinion.

---

**17.** The DOL first adopted USDA rates as the benchmark in 1986, noting that USDA data "[w]ould permit publication of AEWRs early in calendar years." Adverse Effect Wage Rate Methodology, 51 Fed.Reg., 12, 872, 12,-874 (April 16, 1986) (proposed rule).

In rejecting another methodology then under review, DOL noted that its disadvantage was that "[p]rocessing time does not permit publication of the AEWRs before August or September. Ideally AEWRs should be published early in the calendar year, to cover most crops currently using [temporary alien workers] and to permit the new rate to be issued on clearance orders, so as to facilitate the recruitment of U.S. workers." In issuing the final 1986 methodology, DOL reiterate these remarks. *See* 51 Fed.Reg. at 24140. Although the 1986 methodology was replaced by the 1987 methodology, reliance on USDA rates remained the same.